Matthew D. Pearson, SBN 294302
WOMBLE BOND DICKINSON (US) LLP
400 Spectrum Center Drive, Suite 1700
Irvine, California 92618
Telephone: (714) 557-3800
Facsimile: (714) 557-3347
Matthew.Pearson@wbd-us.com

Attorneys for Defendant
SUSSEX PUBLISHERS, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

R.C. and D.G., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SUSSEX PUBLISHERS, LLC, and DOES 1-100, inclusive,

Defendants.

Case No.: 3:24-cv-02609-JSC

The Honorable Jacqueline Scott Corley

**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES; MEMORANDUM OF POINTS AND AUTHORITIES**

[Filed concurrently with (Proposed) Order]

**DATE: June 26, 2025**
**TIME: 10:00 a.m.**
**COURTROOM: 8**

Action Filed: November 30, 2023
Initial CMC: August 1, 2024

# NOTICE OF MOTION

**NOTICE IS HEREBY GIVEN** that on June 26, 2025, at 10:00 a.m. in Courtroom 8 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Sussex Publishers, LLC ("Sussex") will and hereby does move, pursuant to Fed. R. Civ. P. 12(b)(6), for an order dismissing Plaintiffs R.C.'s and D.G.'s (collectively, "Plaintiffs") Third Cause of Action for Aiding and Abetting Unlawful Interception under California's Invasion of Privacy Act ("CIPA"), California Penal Code § 631.

This motion is made on the grounds that Plaintiffs have failed to state against Sussex a plausible claim under CIPA § 631(a) because they have still failed to allege that Google "read, attempted to read, or learn" the contents of their "communications" while the communications were in transit to Sussex.

This motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities; the Court's file and records in this action; and such other evidence and arguments as may be made or presented at or before the hearing on this Motion.

Respectfully submitted,

Dated: May 8, 2025

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Matthew D. Pearson*
MATTHEW D. PEARSON

*Attorney for Defendant*
SUSSEX PUBLISHERS, LLC

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. PROCEDURAL POSTURE AND PRIOR COURT ORDER ..... 3
III. PLAINTIFFS' NEW ALLEGATIONS ..... 6
IV. MOTION TO DISMISS STANDARD ..... 10
V. ARGUMENT ..... 10
    1. How Google Analytics Actually Works. ..... 10
        a. There is no Real-Time Reporting. ..... 16
    2. Understanding How Google Analytics Works Makes Clear that Plaintiffs Cannot State a CIPA § 631(a) Claim. ..... 22
VI. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Cases Page(s)

*Am. Marriage Ministries v. Google, LLC*,
No. 21-MC-80040-SK, 2021 WL 1526757 (N.D. Cal. Apr. 12, 2021)................12

*Apatow v. Am. Bankers Ins. Co*. of Fla.,
No. 16-198 MWF (MRWX), 2016 WL 7422288 (C.D. Cal. Dec. 21, 2016).......10

*Ashcroft* v. Iqbal,
556 U.S. 662 (2009) ....................................................................................10

*Bell Atlantic Corp. v*. Twombly,
550 U.S. 544 (2007) ....................................................................................10

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ...............................................11, 12, 13, 16

*Brown v. Google LLC*,
No. 20-CV-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021).............17

*Grant v. Aurora Loan Servs., Inc.*,
736 F. Supp. 2d 1257 (C.D. Cal. 2010) .........................................................12

*Hershewe v. JOYY Inc.*,
No. 2:20-CV-10611-SB-AFM, 2022 WL 1123208 (C.D. Cal. Mar. 9, 2022) .......6

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)........................................................................17

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) ..........................................................13

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021).........................................................24

*Smith v. Google, LLC*,
735 F. Supp. 3d 1188 (N.D. Cal. 2024) .................................................13, 15

*Torres v. Prudential Fin., Inc.*,
No. 22-CV-07465 (CRB), 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025)23, 24, 25

*Yockey v. Salesforce*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) ..........................................................23

Statute

Cal. Penal Code § 631 ........................................................................passim

Cal. Civ. Code § 1798.150 ........................................................................5

Cal. Civ. Code § 1798.450(a)(1) ..............................................................5

Regulations

Fed. R. Civ. P. 12(b)(6) ............................................................................1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

With every amended complaint Plaintiffs are permitted to file, the fatal flaws in their claims become more apparent. For example, although Plaintiffs attempt to bury it in footnote 8 of their Third Amended Complaint ("TAC"), they now acknowledge that since July 2023, the Google Analytics product currently running on www.psychologytoday.com (the "Site") does not, "[a]ccording to Google,…***collect or store IP addresses***." [Dkt. No. 55, ¶ 58, n. 8 (emphasis added).] Moreover, Plaintiffs now admit that "Before July 1, 2023, Google Analytics 3 (Universal Analytics) collected IP addresses by default and ***used them to help with geolocation data to determine a user's country or city***." [*Id.* (emphasis added).]

In other words, since July 1, 2023, site users' public IP addresses—the primary, if not sole, basis on which the Court found the collected data to be potentially personally identifiable—have not even been collected or stored, let alone used. And prior to that date, as Defendants have repeatedly explained, IP addresses were used solely by Google Analytics to determine a user's general location (i.e., country or city).

These admissions directly undermine the statements made by Plaintiffs' expert Joseph Greenleaf in support of Plaintiffs' Opposition to Sussex's prior motion to dismiss. Mr. Greenleaf stated:

> "The implication of these policies is that, from an IP address, Google may be able to determine the precise location of an individual. That is contradictory to the statement in Paragraph 47 of the Oliver Declaration that the location is limited to the 'country, city, region, or zip code' based on the IP address."

[Dkt. No. 43-1, ¶ 24.] As to the historical use of IP addresses by Universal Analytics (UA360), his opinion flatly contradicts Plaintiffs' recent admission that Google used

IP addresses "to determine a user's country or city." [Dkt. No. 55, ¶ 58, n. 8.] The Court initially found standing based on a "genuine dispute as to whether the IP information, in conjunction with other information Defendant collected, is personally identifying." [*See* Dkt. No. 51, p. 7.] With Plaintiffs new concessions, that dispute no longer exists. Plaintiffs' shifting narrative and belated factual admissions have undermined the basis on which their claims were allowed to proceed in the first place.

Similarly, in the TAC Plaintiffs rely on Figures 7 through 13 and a video, which purportedly demonstrate how Google Analytics *operates* on the site. But as Plaintiffs themselves concede, these Figures do not reflect what they actually experienced during their visits. [*Id*. at ¶ 61 n. 9.] In fact, the version of the Site shown in Figures 7 through 13, and in the video, did not go live until July 2024—at least 8 months after RC and 18 months after DG last accessed the Site. [Dkt. No. 43-2, ¶ 1 (declaring that R.C. visited the Site prior to November 30, 2023); Dkt. No. 43-3, ¶ 2 (declaring that D.G. visited the Site in April 2023)]

Plaintiffs are thus attempting to support their CIPA claims with evidence drawn from web pages they never saw, never used, and which, by their own admission, do not involve the collection or storage of IP addresses. In short, they are trying to manufacture a violation based on functionality that did not exist during their visits and does not implicate private information in any event.

Additionally, Plaintiffs now misrepresent how Google Analytics actually functions. In CIPA litigation, it is well understood that Google Analytics involves two separate streams of communication: one between the user and the website, and another between the user and Google. Plaintiffs ignore this basic distinction and go so far as to claim otherwise. [Dkt. No. 55, ¶ 41 ("When a user accesses a website hosting Google Analytics, Google's JavaScript code surreptitiously reads and analyzes the user's communications sent from the user's browser to the host website while those communications are in transit to the host website.").]

Plaintiffs assert that Google Analytics can somehow read and analyze the

contents of their communications *before* those communications reach the website. That allegation is implausible for several reasons. First, the "communication" that Google Analytics receives is not a copy of Plaintiffs' communication with the Site; it is a separate communication initiated by the browser to Google Analytics *after* the Site has loaded. Plaintiffs offer no explanation of how Google Analytics could possibly "read" data that has not yet been sent to it.

Second, even assuming the relevant question were whether Google could intercept communications between Plaintiffs and the Site before those communications reached the Site, the answer is still no. When a user visits a website, the browser engages in numerous discrete communications—each one initiated by the browser and responded to by the server. For example, a user clicks a link (one request), the server responds (one response), and the browser loads the resulting content. This process happens rapidly and repeatedly, but always sequentially.

Claiming that Google reads these communications *before* they reach the Site is not only technologically wrong, it is directly contradicted by how modern browsers and analytics scripts work, and by recent case law that reflects these technical realities.

At bottom, Plaintiffs have eked by in this litigation by relying on vague, conclusory allegations, claiming that they simply are not in a position now, pre-discovery, to actually support their allegations with facts. They should not be allowed to do so again. There is no dispute as to how Google Analytics operates, and there should be no dispute that those operations to do not result in a violation of CIPA § 631(a). Plaintiffs' claim should be dismissed with prejudice.

## II. PROCEDURAL POSTURE AND PRIOR COURT ORDER

The TAC is the ***fourth*** complaint Plaintiffs have filed in this action. In the original complaint, which was filed in the Superior Court of California, County of San Francisco, Plaintiffs asserted—and, in fact, emphasized—that the Site was sharing with Google "*a copy of any email communications sent to the therapists*" by

potential putative class members. [Dkt. No. 1-11, ¶ 39 (emphasis in original).] Following several meet-and-confers and a Rule 11 letter, Plaintiffs finally acknowledged that the allegation had no basis in fact and omitted it when they filed their First Amended Complaint ("FAC").

The FAC was not without flaws, though. While Plaintiffs repeatedly referenced in the FAC the "medical information" the Site was allegedly sharing with Google, they, as the Court noted, "didn't allege…what that medical information is…." [Transcript, 22:14-23.] In fact, as the Court stated at the hearing, "until [Plaintiffs' counsel] told me that we're just talking about what's put into the search and the IP address, I couldn't tell from [Plaintiffs'] allegations exactly what it was that the plaintiffs" were alleging was shared with Google. [*Id.* at 24:11-14.] Plaintiffs were—again—allowed to amend.

On October 31, 2024, Plaintiffs filed their Second Amended Complaint ("SAC"). [Dkt. No. 36.] For the first time (and almost a full year after filing the original complaint), Plaintiffs alleged which therapist filters they selected on the Site. [*Id.* at ¶¶ 12 (R.C.), 19 (D.G.).] Specifically, R.C. alleged that he selected the following "filters": "anxiety, relationship issues, and emotionally focused therapy (EFT)." [*Id.* at ¶ 12.] D.G. identified "the following filter options: addiction, ADHD, anxiety, autism, depression, drug abuse, marriage counseling, OCD, relationship issues, stress, substance abuse, suicidal ideation, and trauma/PTSD." [*Id.* at ¶ 19.]

On its face, the SAC appeared to address the Court's concerns—namely, Plaintiffs' failure to allege what information ***about them*** they claimed the Site allowed Google to collect. But the declaration D.G. filed in support of Plaintiffs' Opposition to Sussex's Motion to Dismiss only furthered the ambiguity of Plaintiffs' allegations. D.G. declared that the reason she was on the Site in the first place was to obtain "help for a family crisis ***involving [her] adult son***," [Dkt. No. 43-3, ¶ 2 (emphasis added).]. She did not specify and, to date, has not specified whether the "filters" she selected on the Site (e.g., "addiction,…autism, depression, drug

abuse,…substance abuse, suicidal ideation, and trauma/PTSD") related to her or her "adult son." And, of course, the information can only be ***Plaintiffs'*** medical information if it pertains to them.

Beyond that, Plaintiffs continued to assert in the SAC a claim for violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.450(a)(1), [Dkt. No. 36, Second Cause of Action], despite the Court specifically instructing them at the prior hearing to "take a look at [Section] 1798," [Transcript, 25:18-19]. Sussex was therefore required to include in its Motion to Dismiss arguments addressing this claim, only to have Plaintiffs completely abandon the claim in their Opposition. [Dkt. No. 43, p. 8 n. 1 ("Plaintiffs do not challenge the dismissal of the 2nd cause of action under Civ. Code § 1798.150.").]

Perhaps most importantly, Plaintiffs focused almost exclusively in their SAC on Sussex allegedly allowing Google to collect their IP addresses, claiming that IP addresses are "uniquely identifying information." [Dkt. No. 36, ¶ 69 ("By failing to turn on the IP anonymization feature on its website while Universal Analytics was running on its website, Psychology Today automatically captured personal and uniquely identifying information and simultaneously shared that information with Google in a form that was not anonymous."). Their expert even went so far as to claim that "[t]he implication of [Google's] policies is that, from an IP address, ***Google may be able to determine the precise location of an individual***" and that Google's policies are "***contradictory to the statement in Paragraph 47 of the Oliver Declaration that the location is limited to the 'country, city, region, or zip code' based on the IP address***.'" [Dkt. No. 43-1, ¶ 22 (emphasis added).] Plaintiffs even defined the class as persons who had their "uniquely identifying" information disclosed to Google. [*Id.* at ¶ 95 (emphasis added).]

On March 28, 2025, the Court issued its ruling on Sussex's Motion to Dismiss Plaintiffs' SAC. [Dkt. No. 51.] The Court found that Plaintiffs had sufficiently alleged facts to support a finding of injury-in-fact for purposes of Article III standing.

[*Id.*] It also denied the motion as it related to Plaintiffs' claims for violation of California's Confidentiality of Medical Information Act ("CMIA"); violation of CIPA, § 632; and invasion of privacy. [*Id.*][1] The Court's ruling were, in large part, due to "genuine dispute as to ***whether the IP information, in conjunction with other information Defendant collected, is personally identifying***." [*See* Dkt. No. 51, p. 7 (emphasis added).]

The Court did, however, dismiss Plaintiffs' wiretapping claim under CIPA § 631(a). The Court found that "[t]o adequately plead a civil aiding-and-abetting cause of action under section 631," which was Plaintiffs' only basis for imposing liability on Sussex, "a party must plead 'an underlying predicate violation' by the aided party from one or more of three distinct predicate violations," [*Id.* at p. 12], and the only way for Plaintiff to establish such a "predicate violation" was to allege a violation of CIPA § 631(a)'s second clause, [*id.* at p. 13]. That clause, the Court correctly observed, requires Plaintiffs to allege that "the eavesdropping occurred 'while the [communication] is in transit." [*Id.* (quoting Cal. Penal Code § 631(a)).] And, while acknowledging that "[t]he SAC contains detailed allegations of how the software functions and collects information as the user inputs it, and transmits this same information to Google," [*id.*], the "allegations [did] not support a plausible inference Google reads the information 'while the same is in transit,'" [*id*].

The Court provided Plaintiffs with leave to amend their CIPA § 631(a) claim, [*id.*], and Plaintiffs timely filed their TAC on April 24, 2025, [Dkt. No. 56].

## III. PLAINTIFFS' NEW ALLEGATIONS

None of the allegations in Plaintiffs' TAC changes the Court's order dismissing Plaintiffs' CIPA § 631(a) claim. As shown below, the allegations fall into

---

[1] Although Sussex disagrees with these rulings, Sussex has not included in this Motion any dismissal arguments pertaining to Plaintiffs' CMIA, CIPA § 632, and invasion of privacy claims. *Hershewe v. JOYY Inc.*, No. 2:20-CV-10611-SB-AFM, 2022 WL 1123208, at *2 (C.D. Cal. Mar. 9, 2022), aff'd, No. 22-55377, 2023 WL 3316328 (9th Cir. May 9, 2023) (declining to consider "re-arguments" in subsequent motion to dismiss). Sussex expressly reserves its right to challenge these claims later in the case, including on appeal.

one of three buckets: (1) additions to parrot the statute; (2) paraphrased (and misrepresented) Google marketing materials; and (3) factually unsupported (and incorrect) descriptions of how Google Analytics operates. Regardless of the bucket into which they fall though, the allegations do not make it any more plausible that Google "reads, attempts to read, or learns" the contents of their communications "while [they are] in transit".

But while the new allegations in Plaintiffs' TAC do not save their claim, they certainly undermine Plaintiffs' prior arguments and class allegations. Specifically, in footnote 8 of their TAC, Plaintiffs admit: (1) that "[b]efore July 1, 2023, Google Analytics 3 (Universal Analytics) collected IP addresses by default and used them to help with geolocation data to determine ***a user's country or city***.," thereby contradicting their own expert's statement; and (2) that after July 1, 2023, Google Analytics 4 (GA4)…, [a]ccording to Google,…***does not collect or store IP addresses***," thereby rendering Plaintiff's class definition overbroad. [Dkt. No. 55, ¶ 58, n. 8.]

***Examples of Statute-Parroting Additions:***

| SAC Allegation | TAC Allegation (Changes in Red) |
|---|---|
| "This class action lawsuit arises out of Defendant's policy and practice of (1) disclosing to and sharing with third parties, without users' knowledge, authorization, or consent, private and personal information, including sensitive medical information, that Defendant's website, www.psychologytoday.com, has collected while users navigate its online platform and (2) aiding and abetting Google's (and possibly other third party interceptors') unauthorized intercepting, recording, collection and use of California residents' highly personal | This class action lawsuit arises out of Defendant's policy and practice of disclosing to and sharing with third parties, without users' knowledge, authorization, or consent, private and personal information, including sensitive medical information, that Defendant's website, www.psychologytoday.com, has collected while users navigate its online platform. Defendant also has a policy and practice of aiding and abetting Google's (and possibly other third party interceptors') unauthorized (1) intercepting, reading, and learning while |

| | |
|---|---|
| and confidential data and communications." [Dkt. No. 36, ¶ 1.] | in transit and (2) subsequent recording, collection and use of California residents' highly personal and confidential data and communications." [Dkt. No. 55, ¶ 1.] |
| "Google simultaneously is intercepting and receiving their private data in real time, while it is in transit, by using the Google Analytics code that is embedded on the Psychology Today website." [Dkt. No. 36, ¶ 7.] | "Google Analytics is intercepting, reading, analyzing, and transmitting to Google their private inputted data in real time and while the information is in transit to the Psychology Today servers." [Dkt. No. 55, ¶ 7.] |
| "Upon information and belief, Plaintiffs allege that Google received, viewed, and used Plaintiffs' and Class members' information not only to provide analytics services to Defendant, but also for Google's other business purposes including but not limited to (1) improving its own software, algorithms, and other technology and business activities and (2) providing marketing services and offerings, such as creating customer profiles, custom audiences, and targeted advertisements." [Dkt. No. 36, ¶ 31.] | Upon information and belief, Plaintiffs allege that after the initial reading, learning and capturing of users' communications while they are in transit to Psychology Today, Google later also views and uses Plaintiffs' and Class members' information not only to provide analytics services to Defendant, but also for Google's other business purposes including but not limited to (1) improving its own software, algorithms, and other technology and business activities and (2) providing marketing services and offerings, such as creating customer profiles, custom audiences, and targeted advertisement." [Dkt. No. 55, ¶ 31.] |

***Paraphrased Google Marketing Materials:***

| Paragraph: | Allegation |
|---|---|
| 40 | "Google also markets the real-time reporting capabilities of Google Analytics and boasts that "Realtime reports" allow website hosts to 'monitor activity on your website as it happens.' Google further states that 'with Realtime, you can immediately and continuously |

| | |
|---|---|
| | monitor the effects that new campaigns and site changes have on your traffic.' According to Google, website events appear in Realtime reports within seconds after they have been read by Google Analytics and while a user's communication is still ongoing with the website." |

***Examples of Factually Unsupported Descriptions of How Google Analytics Operates:***

| Paragraph: | Allegation |
|---|---|
| 30 | "After Google intercepts, reads, and analyzes users' communications while they are in transit to Psychology Today website servers, Google's JavaScript code then selects which part of the communications will be sent and later used by Google for its advertising and analytics purposes." |
| 41 | "The initial interception and analysis by Google occurs while the entire communication from the user is being transmitted and sent to the host website." |
| 42 | "In essence, the Google Analytics JavaScript code intercepts, reads, and analyzes the substantive content of a user's interactions and communications while they are in transit to the host webpage. The JavaScript code then interprets and selects, in real time, which portions of the communications Google will use for further processing and analysis. The intercepted information read by Google while the entire communication travels from the user to the host website. That simultaneous process enables Google to read and understand the information in real-time and later conduct additional analysis of the information that website users are sharing with the host." |

Put simply, in response to the Court's order dismissing Plaintiffs' CIPA § 631(a) claim, Plaintiffs (1) inserted the phrases "reading and learning" and "while in transit" as many times as they could; (2) cited to Google marketing materials that do not actually say what Plaintiffs claim they say; and (3) misrepresented to the Court

how Google Analytics actually works. None of these allegations saves their claim.

## IV. MOTION TO DISMISS STANDARD

"In ruling on a motion under Rule 12(b)(6), [this] Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Apatow v. Am. Bankers Ins. Co. of Fla.*, No. 16-198 MWF (MRWX), 2016 WL 7422288, at *2 (C.D. Cal. Dec. 21, 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks and alterations omitted). The Court "need not accept as true . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (internal citation and quotation marks omitted). Indeed, the "Court, based on judicial experience and common-sense, must determine whether a complaint plausibly states a claim for relief." *Id.*

## V. ARGUMENT

### 1. How Google Analytics Actually Works.

It is Plaintiffs' duty to clearly and accurately explain to the Court how Google Analytics works. Afterall, Plaintiffs initiated this class action based on their purported understanding of how Google Analytics operates, what information it collects, and how it uses that information. Indeed, CIPA §631(a) requires Plaintiffs to allege these facts to even state a claim.

But, almost eighteen months and four complaints into this lawsuit, Plaintiffs' tactic seems to be the same as it was in the beginning: quote the statute and hope their allegations are vague enough to survive dismissal. Plaintiffs' tactic actually required Sussex to bring demonstratives to the first hearing on Sussex's Motion to Dismiss if, for no other reason, than to set the record straight on how the internet works. When Plaintiffs objected, the Court, itself, pointed out that Plaintiffs' failure to provide detailed allegations was "[p]art of the problem…." [Transcript, 22: 8-23.]

///

///

Furthermore, this is not a situation in which Plaintiff ***cannot*** know how Google Analytics operates without discovery. Google Analytics is one of the most ubiquitous pieces of technology on the internet. *Brown v. Google LLC*, 685 F. Supp. 3d 909, 920 (N.D. Cal. 2023) (noting that "over 70 percent of websites use Google Analytics"). So much so that the Court itself uses the technology on its website, https://cand.uscourts.gov/.




Plaintiffs' counsel cannot feign ignorance, either. Google Analytics is installed and operating on his firm's website, https://www.kellergrover.com/.




Further, case law is replete with descriptions of how Google Analytics operates and the information it collects.

And Google posts online copious materials that describe how Google Analytics works. *Am. Marriage Ministries v. Google, LLC*, No. 21-MC-80040-SK, 2021 WL 1526757, at *2 (N.D. Cal. Apr. 12, 2021) (highlighting that Google "posts a publicly available Google Ads Help Center on its website explaining how Google…Analytics functions"). Plaintiffs themselves even site to Google's online *Analytics Help* page in their TAC. [Dkt. No. 55, ¶ 40, n. 5.][2]

At this point, the below facts are beyond dispute:

***How GA Collects Information:***

1. "When a user visits a website, the user's browser sends a 'GET' request to the website to retrieve it." *Brown*, 685 F. Supp. 3d at 919.

2. "The server responds by sending HTML code to the user's browser."

[2] Given that Plaintiffs cite to and rely on Google's publicly available materials, those materials are incorporated by reference. *Grant v. Aurora Loan Servs*., Inc., 736 F. Supp. 2d 1257, 1264 (C.D. Cal. 2010) ("Th[e] [incorporated-by-reference] rule permits a court deciding a Rule 12(b)(6) motion to consider documents incorporated by reference, but not physically attached to the complaint, if they are central to plaintiff's claim and no party questions their authenticity.").

*James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 945 (N.D. Cal. 2023), *motion to certify appeal denied*, No. 23CV02500EMCEMC, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024).

3. If the HTML code includes Google Analytics JavaScript, the site's code triggers that JavaScript, which then "directs the user's browser to send ***a separate communication to Google.***" *Brown*, 685 F. Supp. 3d at 919 (emphasis added).

4. Thereafter, information is sent to Google via Google Analytics based on actions (referred to as "events") pre-selected by the website operator. Indeed, Google has a full, publicly available webpage that "describes optional, additional events you can configure to measure more behaviors and generate more useful reports for your business."[3] Google Analytics can collect none of these "additional events" unless configured by the site.[4]

***What Information GA Collects:***

1. "When a user visits a website with Google Analytics installed, the tracking code collects ***pseudonymous information*** about how the user interacts with the webpage." *Smith v. Google, LLC*, 735 F. Supp. 3d 1188, 1193 (N.D. Cal. 2024)

2. While some of the information Google Analytics collects is set "[b]y default," *id.* at 1193-94, Google makes clear in its Google Analytics Reference page, which is publicly available[5], that most of the potentially collected information is optional.

[3] *Google Analytics: Reference: Recommended events,* available at: https://developers.google.com/analytics/devguides/collection/ga4/reference/events?client_type=gtag (last visited: May 5, 2025).

[4] *Id.*

[5] *Google Analytics: Reference*, available at: https://developers.google.com/analytics/devguides/collection/protocol/ga4/reference?client_type=gtag#payload (last visited: May 5, 2025).

Payload

Firebase ✓ gtag.js

Data is sent to Google Analytics using the Measurement Protocol Data in two parts:

1. Query parameters
2. A `JSON` `POST` body

query parameters

| Parameter Name | Description |
|---|---|
| `api_secret` | **Required.** An `API Secret` that is generated through the Google Analytics UI.<br>To create a new secret, navigate in the Google Analytics UI to:<br>**Admin > Data Streams > choose your stream > Measurement Protocol > Create**<br>We recommend that you keep these private to your organization. If you deploy the measurement protocol client-side, you should regularly rotate `api_secrets` to avoid excessive SPAM. |
| `measurement_id` | Measurement ID. The identifier for a Data Stream. Found in the Google Analytics UI under:<br>**Admin > Data Streams > choose your stream > Measurement ID** |

JSON post body

| Key | Type | Description |
|---|---|---|
| `client_id` | `string` | **Required.** Uniquely identifies a user instance of a web client. See send event to the Measurement Protocol. |
| `user_id` | `string` | Optional. A unique identifier for a user. See User-ID for cross-platform analysis for more information on this identifier.<br>★ `user_id` may only include **utf-8** characters. |
| `timestamp_micros` | `number` | Optional. A Unix timestamp (in microseconds) for the time to associate with the event. This should only be set to record events that happened in the past. This value can be overridden via `user_property` or event timestamps. Events can be backdated up to 3 calendar days based on the property's timezone.<br>★ This value should be in *microseconds*, not *milliseconds*. |
| `user_properties` | `object` | Optional. The user properties for the measurement. See User properties for more information. |
| `user_data` | `object` | Optional. User-provided data. See the user-provided data guide for more information. |
| `consent` | `object` | Optional. Sets the consent settings for the request. See the consent section for more information. |
| `non_personalized_ads` | `boolean` | Optional. Set to `true` to indicate the user's data should not be used for personalized ads.<br>⃠ **Obsolete:** Use the `ad_personalization` field of `consent` instead of this field. Google Analytics accepts either field, but `ad_personalization` is recommended. |
| `events[]` | `array` | **Required.** An array of event items. Up to 25 events can be sent per request. See the events reference for all valid events. |
| `events[].name` | `string` | **Required.** The name for the event. See the events reference for all options. |
| `events[].params` | `object` | Optional. The parameters for the event. See events for the suggested parameters for each event. |

***How GA Uses the Collected Information:***

1. "When the measurement code collects data, it packages that information up and sends it to Google Analytics ***to be processed into reports***. When Analytics processes data, it aggregates and organizes the data based on particular criteria like whether a user's device is mobile or desktop, or which browser they're using." [6]

2. "***Once the data has been processed and stored in the database***, it will

[6] *Analytics Help: How Google Analytics works,* available at: https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=9931068142561935439-NC (last visited: May 4, 2025) (emphasis added).

appear in Google Analytics as reports."[7]

Based on the above, publicly available information, Google Analytics functions as follows:

- **Step 1:** The user's browser sends a GET request to the website server to load a page (below).




- **Step 2:** The website server responds by sending the user's browser all the necessary assets to render the page including HTML, images, fonts, CSS, metadata and, optionally, the Google Analytics JavaScript. The user's browser downloads and renders this content (below).




- **Step 3:** The sequence outlined in Steps 1 and 2 above is repeated each time the user interacts with the site (e.g. clicks a link). If the site wants to track a specific event, the code on the page triggers Google's JavaScript to execute Step 3 (below), directing the browser to send the event to Google Analytics. Each event consists of (a) a label pre-determined by Google for the category of information (like t: , dl: or dt:, see Figure 14) and (b) a value defined by website's developers (e.g., 'pageview' or 'Home Page'). Since these events are generated within the page's HTML, they can only occur once Steps 1 and 2 have been completed.

[7] *Id.* (emphasis added).




- **Step 4:** After Google has aggregated and processed the data into standard reports, it makes them available to the website operator (below).




a. <u>There is no Real-Time Reporting.</u>

In the TAC, Plaintiffs place significant emphasis on Google Analytics' alleged "real-time reporting." [Dkt. No. 56, ¶ 30.] According to Plaintiffs, "website events appear in Realtime reports within seconds after they have been read by Google Analytics and while a user's communication is still ongoing with the website." [*Id.*] This allegation is misleading, for two reasons.

**First, there is not a continuous conversation.** Plaintiffs vaguely refer to "a user's communication…with the website,"[8] claiming that Google Analytics is able to generate reports while the "user's communication is still ongoing." [*Id.*] Plaintiffs would like this Court to believe that a "user's communication" begins the minute he or she first lands on the site and ends when he or she leaves. But, for purposes of Plaintiffs' CIPA § 631(a) claim, that is not true. In reality, a user's session on a website consists of numerous, separate "communications," and it is these "communications" that Plaintiffs claim Sussex allowed Google to wiretap.

For example, and as shown in Step 1 above, as user's browser first sends a GET request. *Brown*, 685 F. Supp. 3d at 919. "The GET request serves two purposes:

---

[8] For clarity purposes, Sussex has adopted Plaintiff's use of the term "communication" when describing the data transfers between them and the Site. Sussex, however, does not agree that these data transfers are, in fact, communications as that term is used under CIPA.

it first tells the website what information is being requested and then instructs the website to send the information back to the user." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020). The "GET" requests are, therefore, the first "communication." *Id.* at 609 (noting that "the GET requests themselves" are the "communications in question").[9]

The website responds to the "GET" request as instructed, packages the page elements together, including the Google Analytics JavaScript, and sends them to the user, where "[t]he browser then displays the requested information for the user." *Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *1 (N.D. Cal. Dec. 22, 2021). That is the second "communication." Only after this second communication is received and the Google Analytics JavaScript is downloaded into the browser can the page's code instruct Google's JavaScript to send a Google Analytics event to Google's servers.

This sequence repeats on each user interaction on the website. When the user clicks on a link, that action triggers a new request to the website's servers, the server responds to the user's request, and, upon receipt, the user's browser "displays the requested information."

Therefore, contrary to Plaintiffs' allegation, there was no "ongoing communication" between them and the Site; there were multiple discrete "communications," each one completed before the next one could begin. Put simply, the interaction between a user and a website is far more like a text message exchange than a telephone call. Each individual text message (like each individual GET request) is its own communication. And, with the exception of Plaintiffs, no one would claim that a text message was read "while in transit" simply because a previously delivered text message was read before the parties to the text exchange formally ended the exchange.

---

[9] In actuality, the "GET" request is actually a series of much small communications called "data packets."

**Second, "real-time" is not a literal concept.** While Google (and Plaintiffs) may refer to its capabilities as "real-time reporting," Google itself explains its "real-time" label is not technically accurate. On Google's Analytics Help page, which Plaintiffs themselves cite to in the TAC, [Dkt. No. 56, ¶ 40 n. 5], Google explains that its "real-time report" shows "[t]he number of active users during the last 5 and 30 minutes (per minute)."[10] Thus, a more accurate description of Google's "real-time reports" would be a "past five-minutes" or "past thirty-minutes" report.

Even setting aside Plaintiffs' misleading terminology, their description of Google's reporting capabilities is technologically implausible. Plaintiffs appear to allege that Google is able to (1) receive, (2) read, and (3) analyze information transmitted from users' browsers *before* the users' GET requests even reach the website's servers. In other words, Plaintiffs claim that Google somehow intercepts and processes browser communications mid-transit—before the requested page has even been delivered to the user. [Dkt. No. 55, ¶ 134 ("The interception, reading, and analyzing of users' private information and confidential communications occurs while the communications are in transit to Psychology Today website servers.").]

That is not how web traffic or Google Analytics works. A website visit requires a sequence: a GET request from the user, a response from the server, and rendering of the page in the user's browser—typically the most time-consuming step. Only after the page loads and the Google Analytics script executes does any data get sent to Google. To suggest that Google somehow receives, reads, and analyzes the communication *before* this entire process is complete is not only technically inaccurate, but it also defies basic principles of how the internet functions.

**Third, reading a communication "while it is in transit" is impossible with Google Analytics' asynchronous configuration**. The way Sussex implemented Google Analytics on the Site makes any notion of "real-time" interception untenable.

---

[10] *Analytics Help: Realtime reports,* available at: https://support.google.com/analytics/answer/9271392? (last visited: May 5, 2025).

As Plaintiffs acknowledge, Google has offered two types of implementation for Google Analytics: "Google Analytics Synchronous code and Google Analytics Asynchronous code." [Dkt. No. 55, ¶ 38.] As the names suggest, synchronous code loads and executes in sequence with other page elements, potentially delaying the page load. By contrast, asynchronous code--now the standard--loads separately and sends data to Google only ***after*** the browser has received and processed the page content.

Here, Sussex implemented Google Analytics using the asynchronous method (as clearly shown by the presence of the [async] tag adjacent to GA JavaScript in the Site's source code). This means any communication between Plaintiffs' browsers and Google occurred only ***after*** the initial communication with the Site (the GET request) and ***after*** the subsequent response containing the page elements—including the Google JavaScript—were received.

In the screenshot below—publicly available from the Site—the network activity is sorted by timing, with earlier transfers at the top and later ones at the bottom. As shown, the Google Analytics JavaScript is loaded last, by a significant margin. This confirms that Google Analytics was configured not to interfere with or delay the user's experience. Only after the page has fully loaded in the browser—and the Google JavaScript is present—can the Site then instruct Google's JavaScript to POST any data Google Analytics.



Plaintiffs' own TAC disproves the claim that Google Analytics reads communications "in transit." Figures 14 and 15 illustrate this. In Figure 14, the user is on Psychology Today's articles and blog section, which operates under a different Google Analytics account from the directory of therapists (as shown by the distinct tracking ID, labeled "tid"). [*Compare* Dkt. No. 55, Figure 14 (showing "UA-2018278-8" as the tid on the Site's therapist directory section) *with id.* at Figure 4 (showing "UA—2018330-4" as the tid on the Site's articles and blog section).] From a prior page (not shown by Plaintiffs), the user searches the term "anorexia" and presses enter. The following sequence then occurs:

1. The browser sends a GET request to www.psychologytoday.com, requesting articles containing the word "anorexia."

2. The server responds with a search results page titled "Search | Psychology Today," located at [https://www.psychologytoday.com/us/archive?search=anorexia&op=Search](https://www.psychologytoday.com/us/archive?search=anorexia&op=Search).

3. That page includes all the component content (e.g., text, images, headings, surrounding content) and the Google Analytics JavaScript, which the user's browser downloads.

4. Once the Google Analytics JavaScript has finished loading—and only then—the page instructs the script to send a pageview event (labeled t:) to Google Analytics, along with the page URL (dl:) and page title (dt:):

**<u>Figure 14</u>**:

```
Protocol: https
    Host: www.google-analytics.com
    Path: /j/collect

PARAMETERS
       v: 1
      _v: j101
       a: 486144573
       t: pageview
      _s: 1
      dl: https://www.psychologytoday.com/us/archive?search=anorexia&op
          =Search
      ul: en-us
      de: UTF-8
      dt: Search | Psychology Today
      sd: 24-bit
      sr: 1920x1080
      vp: 1903x961
      je: 0
      _u: QACAAAABAAAAAC~
     jid: 328568436
    gjid: 1885013502
     cid: 1272014801.1689159218
     tid: UA-2018278-8
    _gid: 956588897.1689159219
      _r: 1
```

Despite this, in the context of Figure 14, Plaintiffs assert that "subjects searched…are intercepted by the Google Analytics JavaScript code in real-time." [Dkt. No. 55, ¶ 62.] That claim is incorrect. There is no "interception"—each step happens sequentially. The information shown in Figure 14 is sent to Google ***only after*** Plaintiffs' browser has sent its request to Sussex's server, Sussex's server has responded, and Plaintiffs' browser has finished loading the full contents of the page. None of these is visible to or intercepted by Google Analytics. Only the specific value pairs (e.g., values for t:, dl:, and dt:) are sent to Google. And, without an interception, there can be no "reading, attempting to read, or learning" the contents of Plaintiffs' requests while they were "in transit."

At bottom, not only have Plaintiffs contradicted their own expert on what IP addresses can actually identify (they now admit just a "user's country or city"), admitted that as of July 1, 2023, Google Analytics was not even collecting IP address, [Dkt. No. 55, ¶ 58 n.8], and included screenshots in the TAC, and attached a video to it, that do not represent what ***they*** experienced while on the Site, but they also misrepresent how Google Analytics actually works. Enough is enough.

**2. Understanding How Google Analytics Works Makes Clear that Plaintiffs Cannot State a CIPA § 631(a) Claim.**

The only claim under CIPA § 631(a) that Plaintiffs have asserted against Sussex is under the fourth clause: civil aiding and abetting. [Dkt. No. 55, ¶ 136 ("Defendant willingly facilitated, aided, employed, agreed with, and conspired with unauthorized third parties like Google to track, intercept, read, analyze, and use Plaintiffs' and Class members' personal and private communications that were made via the Psychology Today website.").] As stated by the Court previously, aiding and abetting under CIPA can only attach when the plaintiff alleges that the alleged wiretapper—here, Google—violated one of the first three clauses. [Dkt. No. 51,p. 12.] And since the third clause requires a violation of one of the first two clauses and the first clause does not apply to the internet, Plaintiff ***must*** establish that Google

violated the second clause of CIPA § 631(a). [Dkt. No. 51, p. 13.]

The second clause of CIPA § 631(a) makes it a violation to "willfully and without consent of all parties to the communication, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit." *Yockey v. Salesforce*, 688 F. Supp. 3d 962, 970 (N.D. Cal. 2023) (quoting Cal. Penal Code § 631).

In the past, courts, limited in the information they could consider and beholden to oft misleading allegations by plaintiffs, struggled to determine whether technologies, like Google Analytics, operated in a manner that violated CIPA § 631(a)'s second clause. But, thankfully, these novel online-tracking claims have proceeded far enough to allow at least one court to consider whether the ***evidence*** actually supports the plaintiffs' allegations. It does not.

*Torres v. Prudential Fin., Inc.*, No. 22-CV-07465 (CRB), 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025), is one of if not the first cases to consider on summary judgment a CIPA §631(a) claim in an online-tracking case. There, the plaintiffs alleged that Prudential Financial, Inc. and Assurance IQ, LLC violated CIPA § 631(a) by aiding and abetting ActiveProspect, Inc. in intercepting the information plaintiffs inserted into a form on Prudential's and Assurance's websites. *Id.* at * 2.

On summary judgment, the defendants argued that "[e]ven if [ActiveProspect's] software intercepts the contents of Plaintiffs' communications in real time and stores the recording on an ActiveProspect server that ActiveProspect employees can access, nothing in the record plausibly indicates that ActiveProspect reads or attempts to read the contents of the communication while they are in transit." *Id.* at *5. The plaintiffs countered that the "strict interpretation of the while-in-transit requirement" advocated for by the defendants "would mean that CIPA could never apply in the context of the internet, where communications ***are near instantaneous and cannot be meaningfully read or understood until later***." *Id.* at *6 (emphasis added).

While acknowledging that the plaintiffs' argument may or may not be true, Judge Breyer found that the plaintiffs' interpretation of the "while in transit requirement" "would stretch CIPA's statutory language too far" and would improperly sweep into CIPA §631(a)'s purview "any hypothetical future attempt[s] to read or understand the meaning of a communication." *Id.*

The plaintiffs in *Torres* also argued that ActiveProspect's software "functionally reads the data" when it "categoriz[es] and analyz[es]" it. *Id.* at *7. Noting that "courts generally conclude that liability under prong two of section 631 'requires some effort at understanding the substantive meaning of the message, report or communication,'" *Id.* at * 5, Judge Breyer disagreed. According to Judge Breyer, because this categorization and analysis "depends on a set of pre-determined criteria that is mechanically deployed with no intelligible understanding of those values required," "no reasonable jury" could find that ActiveProspect "read" the information while it was in transit. *Id.* at * 7.

The rationale in *Torres* applies squarely to the facts alleged here. First, like the plaintiffs in *Torres*, Plaintiffs here urge this Court not to strictly interpret CIPA § 631(a)'s "in transit" requirement and, instead, focus on whether the alleged "reading" occurred while the overall Plaintiff-Site ***conversation*** was ongoing. That is not now, nor has it ever been, the standard. "[T]he crucial question under § 631(a)'s second clause is whether [the plaintiff] has plausibly alleged that [third party] read one of his communications while it was still in transit, i.e., ***before it reached its intended recipient.***" *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1137 (E.D. Cal. 2021). And, like the plaintiffs in *Torres*, Plaintiffs here have put forth no facts that would allow a reasonable jury to conclude that Google read any of their "communications" (i.e., each, individual GET request) before those communications reached Sussex.

Second, like the plaintiffs in *Torres*, Plaintiffs here insist that automated processes can constitute "reading" under CIPA. That, however, is not what "reading" means. As the court in *Torres* highlighted, courts interpret "reading" under the

second clause of CIPA §631(a) to mean putting forth "some effort at understanding the substantive meaning" of the communication. *Torres*, 2025 WL 1135088 at *5. Plaintiffs have not alleged any such effort here, nor could they. The time in which it takes an individual GET request to reach Sussex's servers is milliseconds.

Ultimately, despite Plaintiffs' repeated use of the terms "reading and learning" and "while in transit," despite their incorrect characterizations of Google's marketing materials; and despite their misrepresentations of Google Analytics' functionality, they still have failed to plausibly allege that Google "read, attempted to read, or learn" the contents of their individual communications while those communications were in transit to Sussex. Their CIPA § 631(a) claim must be dismissed, again.

## VI. CONCLUSION

For the foregoing reasons, Defendant Sussex Publishers, LLC respectfully requests that the Court grant its Motion to Dismiss and dismissed with prejudice Plaintiffs' Third Cause of Action for Aiding and Abetting Unlawful Interception under California's Invasion of Privacy Act, California Penal Code § 631.

Dated: May 8, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Matthew D. Pearson*
MATTHEW D. PEARSON
*Attorney for Defendant*
SUSSEX PUBLISHERS, LLC