Matthew D. Pearson, SBN 294302
**WOMBLE BOND DICKINSON (US) LLP**
400 Spectrum Center Drive, Suite 1700
Irvine, California 92618
Telephone: (714) 557-3800
Facsimile: (714) 557-3347
Matthew.Pearson@wbd-us.com

Attorneys for Defendant
SUSSEX PUBLISHERS, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

R.C. and D.G., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SUSSEX PUBLISHERS, LLC, and DOES 1-100, inclusive,

Defendants.

Case No.: 3:24-cv-02609-JSC

The Honorable Jacqueline Scott Corley

**REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**DATE: June 26, 2025**
**TIME: 10:00 a.m.**
**COURTROOM: 8**

Action Filed: November 30, 2023
Initial CMC: August 1, 2024

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................ 1

II. PLAINTIFFS' CLAIM IS IMPLAUSIBLE, AT BEST. ........................................ 3

A. Plaintiffs' Own Arguments Belie Their Claim. ........................................ 3

B. Plaintiffs' Cited Authority Does Not Support Their Argument. ........................................ 11

C. *Torres* Does, In Fact, Support Dismissal Here. ........................................ 13

III. SUSSEX'S MOTION COMPLIED WITH THE RULES. ........................................ 15

IV. CONCLUSION ........................................ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 1

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 1

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024) ..... 11, 12

*Esparza v. UAG Escondido A1 Inc.*,
No. 23CV0102 DMS(KSC), 2024 WL 559241 (S.D. Cal. Feb. 12, 2024) ..... 11, 12

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ..... 13

*Licea v. Cinmar, LLC*,
659 F. Supp. 3d 1096 (C.D. Cal. 2023) ..... 11, 12

*M.G. v. Therapymatch, Inc.*,
No. 23-CV-04422-AMO, 2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) ..... 12

*St. Aubin v. Carbon Health Techs., Inc.*,
No. 24-CV-00667-JST, 2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) ..... 12

*Torres v. Prudential Fin., Inc.*,
No. 22-CV-7465-CRB, 2024 WL 4894289 (N.D. Cal. Nov. 26, 2024) ..... 13, 14

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) ..... 11

*Valenzuela v. Nationwide Mut. Ins. Co.*,
686 F. Supp. 3d 969 (C.D. Cal. 2023) ..... 11

## I. INTRODUCTION

In their Opposition, Plaintiffs urge this Court to ignore the facts. Sussex explains how Google Analytics actually works, citing to descriptions taken from prior judicial opinions; Plaintiffs tell this Court Sussex's explanation is outside the material it can consider. Sussex cites to and relies on Google's own descriptions of Google Analytics—materials Plaintiffs themselves rely on in the Complaint; Plaintiffs claim consideration of them is improper. Sussex cites to one of, if not the only, substantive decisions in an online-tracker case; Plaintiffs claim the case is inapposite because it was not decided on the pleadings. Put simply, Plaintiffs insist that, at this stage in the litigation, the Court must bury its head in the sand. The Court is not required to do so.

The standard governing this Court is well-settled: "To survive a motion to dismiss, a complaint must contain ***sufficient factual matter***, accepted as true, to 'state a claim to relief that is ***plausible on its face***.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). And "[a] claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). The question this Court must answer, therefore, is whether Plaintiffs have alleged "sufficient ***factual*** matter" to support a "plausible inference" that Google Analytics "read, attempted to read, or learned" the contents of Plaintiffs' online transmissions to Sussex while those transmissions were "in transit."

In its Motion to Dismiss, Sussex did what Plaintiffs should have done from the beginning; it explained, in simple terms, how Google Analytics works. Sussex's rationale for doing so is simple: an understanding of how Google Analytics functions makes it entirely ***implausible*** that Google Analytics reads, attempts to read, or learns anything while Plaintiffs' electronic transmissions are en route to Sussex.

At a basic technical level, visiting a website requires a series of data exchanges between a user's browser and the website's server. When Plaintiffs decided to visit www.psychologytoday.com (the "Site"), their browsers sent a request to Sussex's web server, asking for the Site's content (i.e., the HTML code). The server then responded by transmitting the requested code back to the browser. This request and response ***had to occur*** before any part of the

Site was displayed in either Plaintiff's browser.

This same request and response process continued throughout the entire time Plaintiffs were on the Site. For example, when Plaintiffs clicked on the Site's "Find a Therapist" link, each Plaintiff's browser sent another request to Sussex's web server, which responded with the relevant page content before any portion of it was displayed in their browser. This back-and-forth was a necessary prerequisite to any page being loaded or displayed.

Plaintiffs have never explained this process, despite now having filed four complaints. They also have failed to isolate the specific "communication" they claim Google "read, attempted to read, or learned" while it was "in transit". Nevertheless, if Plaintiffs' alleged "communication" is the transmission to Sussex's server that may be triggered when Plaintiffs click a link or button on the Site, Plaintiff's claim requires this Court to find plausible that Google "read, attempted to read, or learned" the contents of that browser request ***before it reached Sussex's web server***—that is, *"while [it was] in transit".*

Plaintiffs have also never explained how Google Analytics works. As has been explained by countless courts (and plaintiffs in other similar cases), Google Analytics never even receives the browser's requests to Sussex's web server. Rather, after the browser receives Sussex's response and begins rendering the page, an entirely separate transmission is triggered, sent directly from each Plaintiff's browser to Google Analytics' server. That transmission is initiated by code embedded in the page, which Sussex itself has configured to send pre-defined data to Google Analytics. In other words, any "communication" with Google Analytics occurs only *after* Sussex's server has responded to the user's request and *after* the page has loaded in the user's browser.

These are the facts Plaintiffs ask the Court to disregard because, once acknowledged, they make clear that Plaintiffs' claim is implausible. There were two, separate lines of transmissions: one from each Plaintiff's browser to Sussex's web server and another—triggered only after Sussex's server responded and the pages loaded in Plaintiff's browser—from Plaintiff's browser to Google's server. That separation alone defeats any claim of "interception." But, even beyond that, if the Court were to somehow accept that the later browser-initiated transmission directly to Google constituted an "interception," it would have to go one step further and find that Google Analytics

received and processed the transmission *before* the request to Sussex's server reached its destination. Absent that impossible timing, there is no way Google could have received and read, attempted to read, or learned the contents of the Plaintiff-to-Sussex transmission while it was in transit to Sussex.

Of course, Plaintiffs' Third Amended Complaint ("TAC") alleges no facts that would allow the Court to make such a finding, and how could it? Plaintiffs never engage with how the underlying technology actually works. If there were any truth to their theories, they would already have the evidence. They could see it directly in their own browsers, just as anyone can on the estimated 30 million other websites running the same Google Analytics script. There is no reason to believe that Google Analytics behaves differently on Psychology Today's website, this Court's website, or Plaintiffs' counsel's own website. Any meaningful difference would be immediately obvious. Their failure to produce even this most basic, observable evidence, despite having full access to the relevant data for more than 18 months and four complaints, reveals that their feigned need for discovery is not about uncovering facts but about gaining leverage in an expensive litigation.

Plaintiffs have failed to allege "sufficient factual matter" to support a "plausible inference" that Google "read, attempted to read, or learned" the contents of their transmissions to Sussex while they were "in transit." Their claim must be dismissed and, this time, with prejudice.

## II. PLAINTIFFS' CLAIM IS IMPLAUSIBLE, AT BEST.

### A. Plaintiffs' Own Arguments Belie Their Claim.

In their Opposition to Sussex's Motion to Dismiss, Plaintiffs attempt to explain their claim. Their explanation is telling because, unlike in the four complaints they have filed thus far, their explanation does not just recite the elements of a CIPA §631(a) claim—i.e., Google Analytics "read, attempted to read, or learned" the "content of the communication" while it was "in transit" to Sussex. This time, Plaintiffs attempt to substantiate what had previously been bare assertions.

Unfortunately for Plaintiffs though, the minute they deviate from just parroting the language of the statute, their claim falls apart. Take, for example, the following sentence written by Plaintiffs: "When a user ***first accesses*** the Psychology Today website, or any website hosting Google Analytics, the embedded Google code reads and analyzes the user's communications with

the host website." [Dkt. No. 61, 12:28-13:2 (emphasis added).] Contrary to Plaintiffs' suggestion, this sentence does not support a finding that anything was "read, attempted to [be] read, or learned" while it was "in transit." In fact, it proves the exact opposite.

As explained above, when a user "***first accesses***" a website, their browser must first send a request to the website's server. That request originates from the user's browser and does not include any Google Analytics code. If Google Analytics is present on the site, the relevant JavaScript will be embedded in the server's "response" and is not delivered to or executed by the browser until ***after*** the initial request has already reached the site's server. Plaintiffs have it backwards: the Google Analytics code cannot "read" anything while the user's request is in transit to Sussex, because it doesn't exist in the browser, or begin running, until the transmission is complete.

Implicitly admitting this sequence, Plaintiffs argue that "[o]nce a user visits a website and…the ***first*** 'GET' request is completed, the embedded Google code is active and…begins intercepting the user's interactions and communications as they are inputted by the user navigating the website." [Dkt. No. 61, 15:23-16:2 (emphasis added).] In other words, even Plaintiffs acknowledge that Google Analytics is not active until *after* the initial request to the website has completed. Their fallback theory appears to be that Google intercepted later communications during the same session. But this does nothing to support their claim that Google "read, attempted to read, or learned" the contents of the *initial* communication *while it was in transit to Sussex's server*.

In advancing that fallback argument, though, Plaintiffs overlook a crucial fact: there are two transmission streams—one to Sussex's web server and a separate one to Google's server. Even assuming for the sake of argument the content included within the two transmissions is identical (it is not), Plaintiffs' argument still fails. For Google to "read, attempt to read, or learn" the contents of Plaintiffs' transmissions to Sussex's web server while they were "in transit," Google would have to receive and read the Plaintiff-to-Google transmission *before* the original Plaintiff-to-Sussex transmission was completed.

But that's not possible. As explained above, the transmission to Google does not occur until after Sussex's server has responded and the browser has begun rendering the page. The video attached to Plaintiffs' TAC confirms this sequence and definitively disproves any claim that Google

Analytics intercepted anything "in transit' to Sussex.

The parties agree that Google Analytics' transmissions can be seen by anyone on the Site. Indeed, Plaintiffs include Figures 6 through 17 in the TAC as proof of these transmissions. It is also beyond dispute that, by the time the Site's page is visible to the user, the user's "request" and the Site's "response" has already been completed. Plaintiffs' video demonstrates that the Site's page has loaded before Google Analytics transmits any data to Google's server.

At 27 seconds into the video, the user has searched for "Therapists in San Francisco" and the page has loaded, indicating that both the user's request and the Site's response has been completed. Notably absent from the video is any evidence of a transmission to Google Analytics server.




[Dkt. No. 56-1 at 0:27.]

///

///

///

///

//

///

A full five seconds later, at 0:32, the video shows a transmission to Google Analytics.




[*Id.* at 0:32.] This pattern persists throughout the entire video.

| **Button Clicked** | **Page Loads** | **Google Analytics Transmission** |
|---|---|---|
| "All Filters" | 0:53 | 0:58 |
| "Anxiety" | 1:12 | 1:13 |
| "Male" | 1:33 | 1:35 |
| "Show More Specialties" | 2:03 | 2:09 |
| "Drug Abuse: | 2:15 | 2:16 |
| "LGBTQ+" | 2:48 | 2:49 |
| "Spanish" | 3:04 | 3:05 |
| "Show 16 Therapists" | 3:25 | 3:33 |

[*See id.*]

The video thus demonstrates exactly what Sussex argued in its Motion to Dismiss: "any communication between Plaintiffs' browsers and Google Analytics occurred only after the initial communication with the Site (the GET request) and after the subsequent response containing the page elements—including the Google JavaScript—were received." [Dkt. No. 57, 19:10-13.] And, as would be expected, the more information the Site was required to send in response (i.e., searching for "Therapists in San Francisco," "Show More Specialties", and "Show 16 Therapists"), the longer

it took the page to load and the longer it took for Google Analytics to transmit the information (5 seconds, 6 seconds, and 8 seconds, respectively).

Plaintiffs then attempt to pivot, claiming that "the Google Analytics embedded code intercepts, reads, and analyzes the substantive content of a user's interactions and communications …in order to interpret and select what portions of the communications, i.e. user data, to send to Google's external server for further processing and analysis." [*Id.* at 13:2-6.] They also assert that "the intercepted information is read and interpreted by Google's JavaScript code, in real-time, while the user is navigating and interacting with the Psychology Today website" and "[t]hat simultaneous process enables Google to read and understand users' information instantaneously…." [Dkt. No. 61, 13:9-13.] In other words, Plaintiffs claim that Google Analytics "reads, attempts to read, or learns" the content of their transmissions to Sussex before Google Analytics even transmits the information to Google's server (i.e., in the seconds between their clicking a button and Google Analytics transmitting information). Plaintiffs' claim makes no sense.

***First***, Plaintiffs' argument is premised on the idea that Google Analytics—a basic script—is some autonomous being lurking on Plaintiffs' device making click-by-click decisions on what to send or not send to Google's server. That is not true, and Plaintiffs know it.

Google Analytics does not have a brain of its own. It is just a few lines of JavaScript embedded in a webpage's HTML code. It only runs after the page has been received from the Site's server and is loaded in the user's browser. Everything it does happens entirely within the user's browser. It is not remotely controlled by Google, and its behavior is fully visible and inspectable using standard developer tools. If anything unusual were happening, a user could see it. For example, when a user clicks a link to navigate to a new page, the browser first sends a request to Sussex's server. Sussex responds by delivering the new page, including the Google Analytics code. That code is then executed by the browser, and *may* send data to Google, depending on how Sussex has configured it.

The same applies to actions like clicking a button on the same page. When a user clicks, the browser first sends a request to Sussex's server. Only after Sussex responds—with content that includes or triggers the relevant Google Analytics tracking logic—does the browser execute that

code, resulting in a transmission to Google. In every case, any communication with Google occurs only *after* Sussex's server has responded and initiated the execution of the code on the page.

Indeed, if Plaintiffs actually believed that Google Analytics was deciding what information to send on a click-by-click basis, they would not have relied in the TAC on screenshots and video taken well after Plaintiffs visited the site. The only relevant screenshots would be screenshots taken of Plaintiffs' actual interaction with the Site, which Plaintiffs do not attach to the TAC.

***Second*,** Plaintiffs self-servingly conflate Google Analytics and Google. To be clear, Google Analytics is not a stand-alone legal entity. Much like Word is a program offered by Microsoft, Google Analytics is a service offered by Google. Google Analytics has a front-end and a back-end component. On the front-end, Google Analytics consists of JavaScript code embedded in a website's pages. When a user visits a page with that code, the browser may transmit certain usage data to Google's server, but only in accordance with how the website operator has chosen to configure that code.

On the back-end, Google stores and processes the transmitted data to generate reports for the website operator. The resulting reports of aggregated data allow website operators, like Sussex, to determine, among other things, the number of visitors to the site, what pages and how many times a certain link was clicked, etc.

For Plaintiffs to claim that "Google," on the back-end, is able "to read and understand users' information instantaneously" is simply inaccurate. Google receives no data until it is sent by the user's browser at the direction of the site's Google Analytics code. Between the moment at which a user clicks a button and the moment at which Google's server receive a transmission, there is nothing for Google to access, let alone "read and understand."

**Finally,** Plaintiffs argue that "once Google's embedded code is active, it reads and collects data continuously, irrespective of a new webpage loading (as shown in the video attached to the TAC) or a new GET request as inaccurately described by Defendant." [Dkt. No. 61, 16:21-23.] Plaintiffs do not explain precisely what they mean by this statement, but the only button clicks in the video that do not result in a full-page reload are the filter selections. That distinction, however, is irrelevant: even when selecting a filter does not reload the entire page, there is still a request to

Sussex's server (a GET or FETCH request) and Sussex must respond. Only after that response is received can the browser execute Google Analytics' JavaScript and send data to Google's servers. Plaintiffs' video proves this out.

At :53 of Plaintiffs' video, the user clicks on the "All Filters" button, opening the "Select a Filter" slide out panel. The panel button (at bottom) shows that, based on the filters currently selected (none), there are "500+ therapists" that meet the selected criteria.




[Dkt. No. 56-1 at 0:27.]

At 2:15, after the user has selected the "Anxiety" and "Male" filters, the user clicks on "Drug Abuse". If the video is paused at 2:15, the payload panel still shows the key pairs from the previous interaction (ep.item_id: 1002 – Male and epn.result_set: 1132) and the blue button at bottom reads "Show 500+ Therapists". Clicking "Drug Abuse" triggers a fetch request to Sussex's server, which responds at 2:16 with updated data. That response updates the page and then triggers Google Analytics to log the event. This is reflected in the payload panel, which now shows that the user selected the "Drug Abuse" filter (ep.item_id: 253) and that the refined therapist count—computed and returned by Sussex's server—is 232 (epn.result_set: 232). Even though the page does not fully reload, this demonstrates that a client-server exchange is still happening in the background before Google Analytics is triggered. Without that request and response sequence, the

site would have no way of determining how many therapists match the selected filters, nor could it update the therapist count shown to the user or populate the key value pair (epn.result_set: 232) that it triggered Google Analytics' JavaScript to send to the Google Analytics server. It may be busy in that 1 second, but each step is pre-defined and happens in sequence. It's also completely transparent in the browser's developer tools.




[Dkt. No. 56-1 at 2:17.]

In truth, Google Analytics is no more mysterious than an internal combustion engine or an electric lightbulb. The fact that many people use these products without fully understanding how they work does not mean there is any real dispute about *how* they work. Google Analytics is a client-side JavaScript library that resides entirely in the user's browser. It does not operate in the shadows. Its behavior is fully transparent and easily inspectable by anyone using developer tools. It functions the same way on whatever site it is implemented, whether that be the Site, the Court's website, Plaintiffs' counsel's website, or any of the millions of other sites that use it. It is the website owner, e.g. Sussex, the Court, or Plaintiff's counsel, who determines what data Google Analytics can transmit and when. As demonstrated in Plaintiffs' own video, every triggering, execution, and transmission of Google Analytics on the Site occurred ***after*** Plaintiffs had called Sussex's web server and ***after*** Sussex's web server had responded. There simply is no set of facts that could support Plaintiffs' allegations that Google "read, attempted to read, or learned" the

contents of their communication while they were "in transit" to Sussex. Plaintiffs' claim must be dismissed.

**B. <u>Plaintiffs' Cited Authority Does Not Support Their Argument.</u>**

As has become the norm in these cases, Plaintiffs cite in their Opposition to a list of cases that they posit support their claim of in-transit reading, attempting to read, or learning. [Dkt. No. 61, 13:23-14:18.] But as the Court has pointed out several times now, there is no common thread in any of these cases. The opinions are all over the map, and none of the cases cited by Plaintiffs was decided after the pleading stage.

Nevertheless, even the cases that Plaintiffs themselves have opted to cite disprove their claim. For example, Plaintiffs cite to *Esparza v. UAG Escondido A1 Inc.*, No. 23CV0102 DMS(KSC), 2024 WL 559241 (S.D. Cal. Feb. 12, 2024); *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179 (S.D. Cal. 2024); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969 (C.D. Cal. 2023); *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751 (N.D. Cal. 2023); and *Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096 (C.D. Cal. 2023) for the proposition that their allegations, like the plaintiffs' allegations in *Esparza*, *D'Angelo*, and *Valenzuela*, *Valenzuela,* and *Licea,* are sufficient to establish the "in transit" requirement under CIPA § 631(a). [Dkt. No. 61, 13:23-14:18, 19:3-10.] Plaintiffs, however, fail to appreciate the differences between the technology used in those cases and Google Analytics here.

In each of *Esparza, D'Angelo*, *Valenzuela*, *Valenzuela*, and *Licea*, the plaintiffs alleged that the defendant had aided an unlawful wiretap under CIPA § 631(a) by allowing a third party to operate their chatbot (i.e., the customer-service messaging program that appears in the bottom right corner of many websites). *See Esparza,* 2024 WL 559241, at *1 (alleging that "Defendant 'secretly wiretaps the private conversations of everyone who communicates ***through the chat feature***' on Defendant's website, and 'allows at least one third party to eavesdrop on such communications in real time and during transmission to harvest data for financial gain'" (emphasis added)); *D'Angelo*, 726 F. Supp. 3d at 1187 (alleging that "Defendant 'allows Third Parties to wiretap and eavesdrop on ***the chat conversations*** of all its [W]ebsite visitors'" (emphasis added)); *Valenzuela*, 686 F. Supp. 3d at 972 (alleging that "Nationwide pays a third-party…to monitor and store the

conversations that ***occur through the chat feature***" (emphasis added)); *Valenzuela,* 674 F. Supp. 3d at 754 (alleging that "the chat feature 'allows the [third-party] to secretly intercept in real time, eavesdrop upon, and store transcripts of Defendant's chat communications with unsuspecting visitors'" (emphasis added)); *Licea* v, 659 F. Supp. 3d at 1101 (alleging that "Defendant secretly wiretaps the private conversations of everyone who communicates ***through the chat feature*** at [www.frontgate.com](www.frontgate.com)" (emphasis added)).

Chatbot cases are inherently different than cases such as this one because, in chatbot cases, the communication is "first routed through [the third party's] server, enabling '[the third party] to analyze, interpret, and collect customer-support agent interactions in real time to create live transcripts of communications as they occur, among other services.'" *See D'Angelo*,726 F. Supp. 3d at 1187; *see also Esparza,* 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024) (noting that the "chat is routed through [the third party's] servers").

That a Court would find plausible a plaintiff's allegations of in-transit reading, attempting to read, or learning in a chatbot case is not surprising. The very communication that the plaintiff is claiming was wiretapped is first delivered to the alleged wiretapper. That simply is not the case here. Here, Plaintiffs' transmissions to Sussex were not routed through Google. Instead, there were two transmissions—one to Sussex and one to Google—and, as demonstrated above, the latter only occurred long after the first was completed.

The other two cases cited by Plaintiffs—*St. Aubin v. Carbon Health Techs., Inc*., No. 24-CV-00667-JST, 2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) and *M.G. v. Therapymatch, Inc*., No. 23-CV-04422-AMO, 2024 WL 4219992 (N.D. Cal. Sept. 16, 2024)—while involving Google Analytics, differ from this case in one crucial aspect. In both, the plaintiffs had not alleged the use of "asynchronous code" and had not submitted evidence demonstrating the delay between the plaintiffs' initial transmission to the website and Google Analytics' subsequent transmission to Google. In fact, the absence of such allegations dictated the courts' findings. *See St. Aubin,* 2024 WL 4369675, at *7 ("[T]he key to the interception analysis is whether the plaintiff alleges that transmission was simultaneous."); *M.G.*, 2024 WL 4219992, at *4 ("accept[ing] as true" the plaintiffs' allegation of simultaneous transmission).

In contrast, here, Plaintiffs affirmatively allege the existence of "Google Analytics Asynchronous code," [Dkt. No. 55, ¶ 38], and provide video evidence of Sussex using such code on the Site, [Dkt. No. 56-1 (showing Google Analytics transmitting data between 1 and 8 seconds after the Site has loaded)]. Thus, if, as the *St. Aubin* court held, the "key to the interception analysis is whether the plaintiff alleges that transmission was simultaneous," there clearly was no unlawful interception here.

Finally, Plaintiffs' citation to and reliance on the Ninth Circuit's opinion in *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) is misplaced. [Dkt. No. 61, 19:6-10.] Plaintiffs read into *Konop* a false dichotomy. They claim that if a "communication" is not "in storage" then it necessarily is "in transit." [*Id.*] That is not what the Ninth Circuit held in *Konop*. Instead, what the Ninth Circuit stated was that, based on the definition of "electronic communications" in the federal Wiretap Act, an electronic communication could not be intercepted while it was "in storage." *Konop*, 302 F.3d at 878 ("We therefore hold that for a website such as Konop's to be "intercepted" in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage.").

*Konop* said nothing of the situation at issue here—namely, a subsequent transmission directly to the alleged wiretapper (i.e., Google). Indeed, *Konop's* distinction between "in transit" and "in storage" has no application here, where the transmission at issue was never actually "intercepted" at all."

**C. *Torres* Does, In Fact, Support Dismissal Here.**

In their Opposition, Plaintiffs insist that the Court ignore the holding in *Torres v. Prudential Fin., Inc.*, No. 22-CV-7465-CRB, 2024 WL 4894289 (N.D. Cal. Nov. 26, 2024) because (1) *Torres* was decided on summary judgment, not on a motion to dismiss; and (2) *Torres* involved a different technology than the technology at issue here. [Dkt. No. 61, 19:2-20:11.] And if all Plaintiffs had to do to convince the Court to ignore the one, substantive ruling in these online tracking cases was to point out a single procedural and factual difference, then Plaintiffs would be correct. The Court should ignore it.

But that is not how caselaw works. There are always procedural differences, just as there

are always factual distinctions. The question is whether the *rationale* in *Torres* applies to the *facts* of this case. It does.

First, Plaintiffs claim that *Torres* is distinguishable in that the technology in *Torres* was "session replay," not Google Analytics. [Dkt. No. 61, 20:6-10.] This "distinction," however, does not help Plaintiffs' case; it hurts it. As the court in *Torres* explained, session replay collects such granular detail of a user's interactions with a site that it allows a video-like recreation of the "user's real-time interaction." *Torres*, 2024 WL 4894289, at *2. Indeed, session replay even collects "keystrokes" and "mouse movements." *Id.* at *1. Plaintiffs cannot, in good faith, argue that Google Analytics here, which sent separate transmissions directly to Google Analytics 1 to 8 seconds after Plaintiffs' communications with Sussex were complete, was more of an interception than the recording of keystrokes and mouse movements that could later be used to essentially create a recording of the user's site interaction.

Second, Plaintiffs argue that because the third party in *Torres* "stored" the information before viewing it, the third party in *Torres* did not read, attempt to read, or learn the contents of the communications while they were "in transit." Plaintiffs, however, cannot have it both ways. They claim, with regard to Google Analytics, that Google "read, attempted to read, or learned" the contents of their communications the minute they clicked a button on the Site. According to them, it does not matter that Google Analytics had not yet transmitted the information back to Google. Nevertheless, when it comes to the third party in *Torres*, despite the fact that the third party's software was collecting and sending back to its own servers the plaintiffs' interactions with the site, Plaintiffs argue that the "reading" did not occur until a ***person*** "later access[ed] these communications." [Dkt. No. 20:11-17.]

Plaintiffs want to have their cake and eat it, too. When it suits them, they argue that the "reading, attempt to read, or learning" occurs the minute the user interacts with the website. When it does not, they assert that "reading, attempt to read, or learning" only occurs when an actual human access the communication. As the Court held in *Torres*, only the latter is true, and under that analysis, Plaintiffs have not stated a claim for violation of CIPA § 631(a).

## III. SUSSEX'S MOTION COMPLIED WITH THE RULES.

Sussex's Motion seeks the dismissal of Plaintiffs' CIPA § 631(a) claim. Indeed, the Motion's argument section includes just two, concise headings: (1) How Google Analytics Actually Works and (2) Understanding How Google Analytics Works Makes Clear that Plaintiffs Cannot State a CIPA § 631 Claim. [*See* Dkt. No. 57.] The Motion was in response to the alleged changes made by Plaintiffs in their TAC and was limited to the only claim on which the Court had provided Plaintiffs leave to amend. [*See* Dkt. No. 51.]

Nevertheless, Plaintiffs argue in their Opposition that Sussex "improperly puts forth new arguments attacking unrelated, previously asserted allegations in a prohibited successive Rule 12(b)(6) motion." [Dkt. No. 61, 8:13-14.] That is simply not true.

That Sussex highlighted in the Introduction and Procedural Posture sections of its Motion to Dismiss Plaintiffs' ever-shifting allegations and, at times, contradictory arguments is not improper; it is an accurate description of how this case ended up where it is. The Court should know that the screenshots in the TAC and the video attached to it are not accurate representations of the Site Plaintiffs experienced. Just as the Court should know that, while Plaintiffs' expert, Joseph Greenleaf, claimed that "from an IP address, Google may be able to determine the precise location of an individual," Plaintiffs now allege that Google uses IP addresses "to determine a user's country or city," [Dkt. No. 55, ¶ 58, n. 8] and further concede that since July 2023, Google Analytics has not collected or stored IP addresses at all. These are all procedural facts relevant to the record.

Importantly, never once in the Motion to Dismiss, did Sussex invite this Court to revisit its prior order or ask for the dismissal of a claim the Court already refused to dismiss. But in these cases, context is king. That Plaintiffs find the context unflattering does not render Sussex's references improper.

## IV. CONCLUSION

For the foregoing reasons, Defendant Sussex Publishers LLC respectfully requests that the Court grant its Motion and dismissed, with prejudice, Plaintiffs' claim for violation of California Penal Code § 631(a).

Respectfully submitted,

Dated: May 29, 2025

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Matthew D. Pearson*

MATTHEW D. PEARSON

*Attorney for Defendant*

SUSSEX PUBLISHERS, LLC